Rosanne L. Mah (State Bar No. 242628)
**LEVI & KORSINSKY LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Gregory M. Nespole (to be admitted *pro hac vice*)
**LEVI & KORSINSKY LLP**
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*Counsel for Marc Henzel*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC HENZEL, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MELLANOX TECHNOLOGIES, LTD., IRWIN FEDERMAN, JON OLSON, GLENDA DORCHAK, AMAL M. JOHNSON, JACK R. LAZAR, UMESH PADVA, DAVID PERLMUTTER, STEVE SANGHI, EYAL WALDMAN, and GREGORY L. WATERS, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

1

## NATURE OF THE ACTION

1. This action stems from a proposed transaction announced on March 11, 2019 (the "Proposed Transaction"), pursuant to which Mellanox Technologies Ltd. ("Mellanox" or the "Company") will be acquired by NVIDIA International Holdings Inc., a Delaware corporation ("NVA").

2. On March 11, 2019, Mellanox's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with NVA. Pursuant to the terms of the Merger Agreement, NVA will acquire all the issued and outstanding common shares of Mellanox for $125 per share in cash, representing a total enterprise value of approximately $6.9 billion. Once complete, the combination is reportedly expected to be immediately accretive to NVA's non-GAAP gross margin, non-GAAP earnings per share, and free cash flow.

3. On April 22, 2019, Defendants filed a preliminary proxy statement (the "Preliminary Proxy Statement") with the United States Securities and Exchange Commission (the "SEC") in connection with the Proposed Transaction.

4. The Preliminary Proxy Statement omits material information with respect to the Proposed Transaction, which renders it false and misleading. Accordingly, Plaintiff alleges herein that Defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Preliminary Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Securities Exchange Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the

transactions and wrongs complained of herein occurred in this District.

**PARTIES**

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Mellanox common stock. Defendant Mellanox trades on the NASDAQ under the symbol "MLNX" and purports to be a leading supplier of end-to-end Ethernet and InfiniBand intelligent interconnect solutions and services for servers, storage, and hyper-converged infrastructure.

9. Founded in 1999, Defendant Mellanox is headquartered in Sunnyvale, California and Yokneam, Israel.

10. Defendant Irwin Federman is Chairman of the Board of the Company.

11. Defendant Jon A. Olson is a director of the Company and chair of the Company's audit committee.

12. Defendant Glenda Dorchak is a director of the Company since July 2009, and currently a member of the nominating and corporate governance committee.

13. Defendant Amal M. Johnson has served as a member of the Company's board of directors since October 2006 and currently is a member of the compensation committee.

14. Defendant Jack R. Lazar is a member of Mellanox's board of directors and is currently a member of the audit committee and the compensation committee.

15. Defendant Umesh Padval has served as a member of the Company's board of directors since February 2018, and currently chairs the compensation committee.

16. Defendant David Perlmutter has served as a member of the Company's board of directors since May 2014 and currently is a member of the audit committee.

17. Defendant Steve Sanghi has served as a member of our board of directors since February 2018, and currently chairs the nominating and corporate governance committee. Defendant Graham Smith is a director of the Company.

18. Defendant Eyal Waldman is the Company's President, CEO, and a Director since March 1999. He is the Company's co-founder of Mellanox.

19. Defendant Gregory Waters is a member of Mellanox's board of directors, and he currently is a member of the of the nominating and corporate governance committee.

3
CLASS ACTION COMPLAINT

20.     The Defendants identified in paragraphs 10 through 19 are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Mellanox (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action.

23.     The Class is so numerous that joinder of all members is impracticable. As of April 29, 2019, there were approximately 54 million shares of Mellanox common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

24.     Questions of law and fact are common to the Class, including, among others, whether Defendants violated the 1934 Act and whether Defendants will irreparably harm Plaintiff and the other members of the Class if Defendants' conduct complained of herein continues.

25.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**I.     Background of the Company and the Proposed Transaction**

28. Mellanox is a leading supplier of end-to-end Ethernet and InfiniBand intelligent interconnect solutions and services for servers, storage, and hyper-converged infrastructure. Mellanox's intelligent interconnect solutions increase data center efficiency by providing the highest throughput and lowest latency, delivering data faster to applications and unlocking system performance. Mellanox offers a choice of high-performance solutions: network and multicore processors, network adapters, switches, cables, software and silicon, that accelerate application runtime and maximize business results for a wide range of markets including high performance computing, enterprise data centers, Web 2.0, cloud, storage, network security, telecom, and financial services.

29. The Company recently settled a much-publicized dispute with major shareholder Starboard Value. On January 8, 2018, Starboard Value, the Company's largest shareholder at the time, sent a letter to Mellanox criticizing the Company's targets and prospects.

30. On June 18, 2018, the Company and Starboard Value settled the dispute by reaching an agreement whereby directors Olson and Waters would join the Board as Starboard nominees and director Lazar would join as a director mutually agreed to by both parties.

31. With a potential proxy battled averted, the Company began to report exceedingly solid results including record fourth quarter and annual 2018 results exceeding expectations while maintaining flat operating expenses year-over-year.

32. Specifically, on January 30, 2019, the Company reported as follows:

> Mellanox® Technologies, Ltd. (MLNX), a leading supplier of high-performance, end-to-end interconnect solutions for data center servers and storage systems, today announced preliminary financial results for its fourth quarter and fiscal year 2018.
>
> "Mellanox had an outstanding 2018, delivering 26% annual revenue growth and achieving $1.09 billion in revenue for the first time in our history. We leveraged top line growth and strong expense discipline to accelerate profitability. We expect to carry this momentum into 2019 and deliver another year of healthy, double-digit revenue growth to drive operating margins even higher," said Eyal Waldman, President and CEO of Mellanox Technologies.
>
> "We achieved record quarterly revenue in our Ethernet switch business, capitalizing on design wins for our high-performance, feature-rich solutions, which support continued growth in 2019. We maintained our leadership in 25 gigabit and above Ethernet adapters and continue to

benefit from the multi-year transition to higher speeds. Revenue for our 100 gigabit Ethernet adapters in 2018 was approximately 2.5 times that of 2017, an indication that the transition to 100 gigabit technology has begun, which will drive the next leg of growth. We are also gaining traction in a new growth vector for the next generation of intelligent interconnect with our BlueField SmartNICs and Storage Controllers.

We grew our InfiniBand business 8 percent year-over-year and see strong demand for our leading performance HDR 200 Gigabit per second InfiniBand solutions for high-performance computing, artificial intelligence, big data, cloud, storage, and additional applications. Our HDR InfiniBand solutions have begun to ramp with a healthy backlog for Q1 and beyond. We achieved record Q4 and 2018 revenue with our LinkX cables and transceivers and expect to continue seeing healthy growth of our LinkX product line in 2019. We continue to invest in research and development to maintain our leadership across all product lines to fuel our growth in 2019 and beyond," Mr. Waldman concluded.

33. On February 1, 2019, *Seeking Alpha* published a very "bullish" report noting that the Company's growth was unabated by "weak commentary" from Intel and NVA concerning high-end Ethernet NIC demand. The report stated "Mellanox (MLNX) showed again that they can deliver strong growth even in a period of 'digestion' for major customers. Mellanox continues to do quite well in the high-end data center market, and I expect 2019 to be another year of double-digit growth with margin improvement."

34. Commenting on the Company's "six quarter streak of year-over-year revenue growth," the report noted:

> Revenue rose 22% yoy and 4% qoq in the fourth quarter, beating expectations by about 2%. Ethernet momentum softened as expected, up 21% yoy but down 15% qoq, as customers "digest" prior purchases, but InfiniBand came roaring back with 33% year-over-year and 38% qoq growth, led by EDR/HDR with the availability of 200Gbps product. Although management didn't break out the Ethernet business further, the switch part of the business is now annualizing at over $100M/year, roughly doubling from the year-ago level.
>
> Margins were fine on balance. Gross margin declined 60bp from the prior quarter, but still rose slightly (20bp) from the year-ago quarter, and non-GAAP operating income more than doubled from the year-ago level, while growing a little less than 8% from the prior quarter. All told, Mellanox beat the expected operating margin by about 100bp for the quarter, which marks yet another strong performance on operating costs since management bowed to pressure from an activist investor to rein in spending.
>
> The Growth Story Continues…
>
> Nothing in Mellanox's guidance leads to me to worry about the near-term prospects for the company. Management's guide for the first

quarter of 2019 was about 6% above the prior average sell-side estimate, while the midpoint of the gross margin guidance range was more than a point above the sell-side expectation.

35. On March 11, 2019, the Company announced it would be acquired by NVA in a transaction valued at $6.9 billion. The press release concerning the Proposed Transaction stated, in pertinent part, as follows:

> NVIDIA and Mellanox today announced that the companies have reached a definitive agreement under which NVIDIA will acquire Mellanox. Pursuant to the agreement, NVIDIA will acquire all of the issued and outstanding common shares of Mellanox for $125 per share in cash, representing a total enterprise value of approximately $6.9 billion. Once complete, the combination is expected to be immediately accretive to NVIDIA's non-GAAP gross margin, non-GAAP earnings per share and free cash flow.
>
> The acquisition will unite two of the world's leading companies in high performance computing (HPC). Together, NVIDIA's computing platform and Mellanox's interconnects power over 250 of the world's TOP500 supercomputers and have as customers every major cloud service provider and computer maker.
>
> The data and compute intensity of modern workloads in AI, scientific computing and data analytics is growing exponentially and has put enormous performance demands on hyperscale and enterprise datacenters. While computing demand is surging, CPU performance advances are slowing as Moore's law has ended. This has led to the adoption of accelerated computing with NVIDIA GPUs and Mellanox's intelligent networking solutions.
>
> Datacenters in the future will be architected as giant compute engines with tens of thousands of compute nodes, designed holistically with their interconnects for optimal performance.
>
> An early innovator in high-performance interconnect technology, Mellanox pioneered the InfiniBand interconnect technology, which along with its high-speed Ethernet products is now used in over half of the world's fastest supercomputers and in many leading hyperscale datacenters.
>
> With Mellanox, NVIDIA will optimize datacenter-scale workloads across the entire computing, networking and storage stack to achieve higher performance, greater utilization and lower operating cost for customers.
>
> "The emergence of AI and data science, as well as billions of simultaneous computer users, is fueling skyrocketing demand on the world's datacenters," said Jensen Huang, founder and CEO of NVIDIA. "Addressing this demand will require holistic architectures that connect vast numbers of fast computing nodes over intelligent networking fabrics to form a giant datacenter-scale compute engine.
>
> "We're excited to unite NVIDIA's accelerated computing platform with Mellanox's

world-renowned accelerated networking platform under one roof to create next-generation datacenter-scale computing solutions. I am particularly thrilled to work closely with the visionary leaders of Mellanox and their amazing people to invent the computers of tomorrow."

"We share the same vision for accelerated computing as NVIDIA," said Eyal Waldman, founder and CEO of Mellanox. "Combining our two companies comes as a natural extension of our longstanding partnership and is a great fit given our common performance-driven cultures. This combination will foster the creation of powerful technology and fantastic opportunities for our people."

The companies have a long history of collaboration and joint innovation, reflected in their recent contributions in building the world's two fastest supercomputers, Sierra and Summit, operated by the U.S. Department of Energy. Many of the world's top cloud service providers also use both NVIDIA GPUs and Mellanox interconnects. NVIDIA and Mellanox share a common performance-centric culture that will enable seamless integration.

Once the combination is complete, NVIDIA intends to continue investing in local excellence and talent in Israel, one of the world's most important technology centers. Customer sales and support will not change as a result of this transaction.

Additional Transaction Details

36.     Post close, the transaction is expected to be immediately accretive to NVIDIA's non-GAAP gross margin, non-GAAP earnings per share and free cash flow. NVIDIA intends to fund the acquisition through cash on its balance sheet. In addition, there is no change to its previously announced capital return program for the rest of fiscal 2020. The transaction has been approved by both companies' boards of directors and is expected to close by the end of calendar year 2019, subject to regulatory approvals as well as other customary closing conditions, including the approval by Mellanox shareholders of the merger agreement. The Company's strong earnings reports continued after the announcement of the Proposed Transaction. Specifically, on April 16, 2019, the Company reported "record first quarter revenue. The press releases stated, in part, as follows:

> Mellanox delivered record revenue in Q1, achieving 5 percent sequential growth and 22 percent year-over-year growth. All of our product lines grew sequentially, showing the benefits of our diversified data center strategy," said Eyal Waldman, president and CEO of Mellanox Technologies. "Our R&D execution has resulted in differentiated products, while at the same time we have generated operating margin of 14.6% on a GAAP basis and 28.3% on a non-GAAP basis. Additionally, we increased cash and short-term investments by $114 million during the quarter.

Across InfiniBand and Ethernet product lines, our innovations are driving continued market leadership. Our 200 gigabit HDR InfiniBand solutions are enabling the world's fastest supercomputers and driving our overall InfiniBand growth. During Q1, HDR InfiniBand connected tens-of-thousands of compute and storage end-points across supercomputing, hyperscale, and cloud data centers around the globe to achieve breakthrough performance. Our Ethernet solutions continue to penetrate the market for both adapters and switches. Our market leadership in 25 gigabit per second Ethernet solutions is well established, and our 100 gigabit per second solutions are the fastest growing portion of our Ethernet adapter product line. We are also encouraged by the adoption of our BlueField System-on-a-Chip and SmartNIC technology. With further innovations to come, Mellanox is well-positioned to continue its growth trajectory," Mr. Waldman concluded.

**II.     The Proxy Statement Omits Material Information, Rendering It False and Misleading**

37.     Defendants filed the Preliminary Proxy Statement with the SEC on April 22, 2019 in connection with the Proposed Transactions

38.     As set forth below, the Proxy Statement omits material information with respect to the Proposed Transaction.

39.     The Proxy Statement omits material information regarding the Company's financial projections and the analyses performed by the Company's financial advisor in connection with the Proposed Transaction, J.P. Morgan Securities LLC ("J.P. Morgan").

40.     With respect to the Company's financial projections, the Proxy Statement fails to disclose: (i) all line items used to calculate EBITDA and (ii) a reconciliation of all non-GAAP to GAAP metrics.

41.     With respect to J.P. Morgan's Discounted Cash Flow Analysis, the Preliminary Proxy fails to disclose: (i) the individual inputs and assumptions underlying the range of discount rates of 10.0% to 12.0%; (ii) the basis for the Company's estimate of a 2.5% terminal value growth rate in the industry in which the Company operates; and (iii) the individual inputs and assumptions underlying J.P. Morgan's decision to apply a perpetual growth rate ranging from 2.0% to 3.0% to the unlevered free cash flow of the Company.

42.     The disclosure of projected financial information is material because it provides

stockholders with a basis to project the future financial performance of a company and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

43. The omission of the above-referenced material information renders the Preliminary Proxy Statement false and misleading, including, *inter alia*, the following section: (i) Background of the Merger; (ii) Recommendation of the Board of Directors and Reasons for the Merger; (iii) Opinion of J.P. Morgan; and (iv) Management Projections.

44. The omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder**

**Against All Defendants**

45. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

46. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Defendant Mellanox is liable as the issuer of these statements.

47. The Preliminary Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Preliminary Proxy Statement.

48. The Individual Defendants were at least negligent in filing the Preliminary Proxy Statement with these materially false and misleading statements.

49. The omissions and false and misleading statements in the Preliminary Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on

the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

50. The Preliminary Proxy Statement is an essential link in causing Plaintiff and the Company's stockholders to approve the Proposed Transaction.

51. By reason of the foregoing, Defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

52. Because of the false and misleading statements in the Preliminary Proxy Statement, Plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act

### Against the Individual Defendants

53. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

54. The Individual Defendants acted as controlling persons of Mellanox within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Mellanox and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Preliminary Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

55. Each of the Individual Defendants was provided with or had unlimited access to copies of the Preliminary Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

56. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein and exercised the same. The Preliminary Proxy Statement contains the unanimous recommendation of the

Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Preliminary Proxy Statement.

57. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

58. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to file the Preliminary Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that Defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

///
///
///
///
///

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 1, 2019          **LEVI & KORSINSKY, LLP**

By: /s/ *Rosanne L. Mah*
    Rosanne L. Mah

Rosanne L. Mah
**LEVI & KORSINSKY LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Gregory M. Nespole (to be admitted *pro hac vice*)
**LEVI & KORSINSKY LLP**
55 Broadway, 10th Floor
New York, NY 10002
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*Counsel for Marc Henzel*